Today, we are asking the Court of Appeals to reverse the lower court's grant of summary judgment in favor of Defendant Andrew Homoly and against Robol Construction on its breach of contract claim. The waters have been somewhat muddied, but today, the issues before the Court are fairly straightforward. Considering all the evidence in the record and imbued in the light most favorable to plaintiff, is it reasonable to infer that first, the parties entered into a contract whereby Homoly agreed to personally guarantee 40% of a loan Robol Construction made to Homoly and Robol LLC? And second, if so, does this agreement violate the operating agreement or the Kansas statute of frauds? Yes, it's a valid loan, though that's not necessarily the burden we have to carry in proving that it's a valid loan today. Our position is that the email from Andrew Homoly in which he said, I would prefer the money from Robol be considered a loan and you guys get repaid with interest. Taken with the financial quarterly statements that were sent to Homoly over a four and a half year period, in which this money was categorized as a liability and treated as a loan by the company, is sufficient to, at the very least, raise a reasonable inference that it was a valid loan. But you quoted his statement, with that in mind, I guess I would prefer not exactly unequivocal language, particularly when followed by, if Steve would rather me put in a capital call, however, I will go ahead and write the check. It's not unequivocal, but our position is that there are at least various reasonable interpretations that could be taken from his statement. Especially when you consider the fact that the quarterly financial statements treated these monies as a loan. It's our position a reasonable jury can infer that in fact the decision was made to borrow funds from Robol Construction. Was there ever a promissory note written up? It's our position that the 2006 email agreement and the paragraph eight of the bi-cell agreement, when taken together with the quarterly financial statements, constitute a contract for- Promissory note. There's no promissory note within the four corners of a document. But I would like to draw the honor's attention to the language of paragraph eight of the bi-cell agreement, which states that Robol and Homley hereby agree to personally guarantee any and all company loans if requested. First got to be a company loan. That's correct. Which has to be approved by a supermajority of the interest. That's correct. In section 603D of the operating agreement requires consent of supermajority. It does not by the plain language require written consent. And it's our position that the four and a half years of emails sent to Homley with the financial statements that were showing his company was borrowing money from Robol Construction. The fact that he never said, I don't consent to this, I don't think we should borrow these funds. A reasonable jury can infer that he did in fact consent to this loan. And his 2006 email, though not explicit, could at least allow for reasonable inference that that is a writing evidencing. He not only- You don't think you have a statute of frauds problem. Preferred the loan. Excuse me? You don't think you have a statute of frauds problem? I don't think we have a statute of frauds problem. I think that, well first, I think that this promise falls outside the statute of frauds. Under the main purpose doctrine, where the primary benefit for entering into the guarantee is for Homley and not the company. Here, the company did require a cash infusion, but the company had two options. It could do a capital- I guess my other question is, where would one find in the proof that the appellee here approved this loan before it being issued? Well, Roble, excuse me, Steve Roble, President of Roble Construction, says that in his deposition, they discussed it several times. Vera testifies in her deposition that they discussed it several times. These discussions are then confirmed by that 2006 email. And then, we would also argue that drawing a reasonable inference from these facts in light of the fact that Homley received his own company's financial statements over a four and a half year period. These statements treated this money as a loan to the company. He never objected to this treatment. He never said, I didn't consent to this treatment. And in fact, he called Sarah Laffer, an employee of Roble Construction, panicked about his growing debt on the loan. So it's our position that this evidence, when taken together and viewed in a light most favorable to plaintiff, a reasonable jury could at least infer that he did consent to this company loan. Well, my law clerk's reviewed the record, and it's clear that Mr. Roble, and maybe others, Mr. Roble, said that Homley guaranteed, gave his personal guarantee orally of the loan, that he said he would do that. So there's some evidence, and we're here on summary judgment. And so you've got some evidence, so then it may defeat a summary judgment. But the issue, I think that Judge Smith said about it, about the statute of frauds, which is, and you really, you didn't even address it in your response here. Why, are you waiving that response on the statute of frauds? No, Your Honor, we're not waiving that at all. We fully briefed it in our lower motions on summary judgment. Excuse me, pleadings on summary judgment. It's our position that the buy-sell agreement, which uses that language hereby agrees, and effectuates that personal guarantee language within the buy-sell agreement. When you take that with the financial statements and that 2006 email, and the law does allow you to take multiple writings as evidence of a written contract. When you take these three together, we have what's- We have- Is your argument that the written contract is the buy-sell agreement? And then all you're looking at is under that contract, whether there's sufficient facts to show that they made the capital, or well, money went in, you infused money. And that triggers the written contract, the buy-sell agreement, and I'm trying to figure out quite what your statute of frauds argument is. Well, we have two statute of frauds. One is the promises outside the statute of frauds under the main purpose doctrine. Because this loan was only made, and we believe it's reasonable to infer that Homley knew the personal guarantee would be attached to this loan at his request, so he could avoid a big size hit to his liquidity. The company needed cash, but they could have gotten it through a capital call. Homley stated in his email, he is willing to make that call. So we believe the primary purpose of the personal guarantee was for his own benefit, to maintain his company in this interest, and to avoid that huge hit to his liquidity. We also think that, again, when taken together, the personal, the buy-sell agreement, which limits his liability on any company loan to 40% of the total loan. The financial statements and the 2006 email, when taken together, provide the material terms necessary for a personal guarantee. Well, I guess I didn't understand. I thought your argument was that paragraph eight of the buy-sell agreement refers to person guarantees for a personal guarantee, shall give loans and guarantee only to the sharing ratio. That that took it out of the statute of frauds, because he signed that and agreed to that. No, your honor, we're saying that satisfies the written consent requirement, the 6.03i of the operating agreement. But taken together, and that's an essential part of the agreement, but you have to take together the 2006 email and the financial statements when read together. That satisfies the statute of frauds. Well, I thought under paragraph eight, all you had to prove was somebody asked him to guarantee it. And you got the testimony of Robles says, I asked for it. No, that's not our stance. Our stance is that paragraph eight is triggered by a request, but not necessarily that paragraph eight in and of itself satisfies the statute of frauds. We're arguing that the three documents I've been referring to, when read together, provide the essential terms required for the statute of frauds and meet the writing requirement. The lower court's holding does turn on whether or not Roble construction requested that Homley personally guarantee the loan. And finds that there's no evidence in the record to indicate he did. We believe that the email, when you take the email, together with Robles' testimony and additional evidence in the record, including Sarah Laffer's email to Homley in October of 2007 that says, the statement attached shows the growing receivable to Roble Construction and the amount Roble Construction and you need to pay to clear this loan. When you take these together, there's a reasonable inference that Roble Construction, in fact, requested that Homley personally guarantee this loan, and that Homley did agree to guarantee this loan. And I'd like to reserve the remainder of my time for a rebuttal. Okay, you may. Good morning, Mr. White. Good morning, Your Honor, how are you? May it please the court. My name is David White. I'm honored to be here representing Andrew Homley in this matter. This is a fortuitous time that we just finished the first games of the pro football season. And there's a lot of people looking at both the Chiefs and the Rams, money, money, quarterbacking of what went wrong yesterday. Well, that's exactly what this case is about. It's money, money, quarterbacking on a failed company as to who's going to bear the loss. And if we look at everything as it progressed chronologically, because that's the way it did progress, you'll find that they attempted early on to comply with corporate law. And to run this corporation the way it was supposed to. However, it quickly divulged into something much more than that. And that is the problem that the appellant has in this case, is they didn't follow the rules. You have to remember that Homley and Roble LLC has two members. Andrew Homley, who's an individual, and Roble Construction Company, which is a Kansas corporation. All of this is under Kansas law, which is a unique thing for the 8th Circuit, I know. Because we've got Missouri, Kansas, everybody else here, but it's Kansas law. It's not drastically different from Missouri law, or other states in the Midwest, but it is Kansas law. The key is, is that Steve Roble was the president of Roble Construction Incorporated. He was a 60% owner of Homley and Roble. Vera Roble, his wife, had no corporate office that is shown in the record at all. She was, quote, merely helping out with accounting. So you have to remember that too, because it's going to be key as to who made the request, when it was made, and under what authority. This is a real estate development company. This company went into business, by 2004, the record reflects it was having problems. By 2006, it was cash strapped, and it was having a lot of problems, which leads to the facts in this case. It had, prior to that, entered into a land development loan with the North American Savings Bank. And those records are in the file, and it also shows that in both of those, there were written guarantees by the Robles and by the Homleys, guaranteeing that loan. And that's again, important to remember, because we don't see anything more like that in any of the rest of the record. The testimony in depositions was that the concept was Roble Construction was going to be the money. Mr. Homley was going to be the on-the-job manager. That's why the 60-40 was there, because the risk for the money was with Roble, and the job to get done was Homley's. Two documents, two documents, and only two documents for the basis of this arrangement. And we've talked about it at nauseam, but the operating agreement, it has two key points. Actually, three key points. 6.03D says there will be no obligation over $10,000 without unanimous consent of the members. Number two, the members' consent will be in writing and be made personally before they're obligated. And three, there is no personal liability unless it's in writing, and that's in 13.10. The by-sale agreement in section eight says that Roble and Homley will be personally guaranteed a loan to any lender. This is not Roble meaning Steve Roble. Roble is Roble Construction Company. And the key is Roble Construction Company and Homley agree they're going to guarantee. And that's important, folks, because it refers to such lender. Remember, if Roble Construction Company is going to be personally guaranteeing its loan to the company, does that follow logic? No, it does not. What this contemplated was something like the North American Savings Bank loan, where a outside lender is asking you, no, you're not going to be able to hide behind the protection of LLC, you're going to have to personally put your own money at risk. The only time it was asked for was for North American Savings Bank, and that loan was guaranteed as requested. In order to get a personal guarantee, there are three steps as provided in paragraph eight, section eight. First is, there has to be an application for a loan with a lender. Number two, that that lender is going to require personal guarantees in order to make the loan. And number three, that a request is made by both the lender and by the company, which is the LLC, Homley and Roble, that you guarantee it. With those, you cannot stop the financing that the company needs. In order to get a loan over $10,000, it takes the unanimous consent of the members. Number two is, once you have the unanimous consent, there must be a lender who requires your personal guarantee as well as the company requires your personal guarantee. And three, you can't withhold that. Ladies and gentlemen of the court, no such requests was made. No such loan was applied for. And if you look at the record, you will find out in looking at Vera Robles' email of July the 31st, 2006, it goes on and on. And do read the entire email stream, because the very, very important part is the actual last email that's in the string, which is seldom referred to by the appellant. First is, she says we need $71,000. Number two is, we can do it by capital call. Or we're going to have to, Robled Construction's going to have to advance the money. If you look in the email, it says later that they've advanced money four times before. Four times before. And what has happened is as lots are sold, as houses are sold, they get paid the first dollars out. No personal guarantee for those loans. Was ever requested, ever discussed, or anything else. And the court needs to know that this is a $71,000 loan, but yet we have got the appellant is saying there's $431,000 out there that are owed. Of which they want Mr. Robled, Mr. Hollily to pay $172,000. There's a long ways between $71,000 and $431,000. Where is it? The only thing the appellant relies on is an email string from Vera Robled, who is quote, unquote, helping out with the accounting. Council, what was the district court's basis for its decision to grant summary judgment? I think it's very, very clear. Judge Wright doesn't grant summary judgment very often, especially to defendants. So we noted that, and he said that this may be a loan, but it's a loan by Robled Construction to the LLC. It's the debt of the LLC. It was never personally guaranteed because it did not meet the three criteria that are provided for in the by-sale agreement. That's all he said. He said it may have been a failed capital call, but there's no doubt that Robled Construction loaned money to the LLC. No doubt about it. But at no time was Mr. Homily, did he agree to a personal guarantee. And again, if you look at what is contemplated in the original legal documents, what happened thereafter with the North American Savings Bank, I think it's real easy to figure it out. That this contemplated that there would be a promissory note, and then there would be written personal guarantees for each promissory note. Not a blanket statement in the first day of the existence of the LLC that by the way, I'm guaranteeing everything. What is the purpose of an LLC? It's supposed to provide you protection for outside debt. And the way the appellant gets around, well it's not outside debt, this is inside debt. Well, that's not what is contemplated here, because if you look at the section immediately prior to section eight in the buy-sell agreement, you'll find out it discusses financing. And it says, if you cannot make a capital call, there is a provision for one member to loan the other member money. But that was never been referred to, referenced in anything in this case. It is merely after the fact that Roble Construction is saying, we kept funding a losing business, we now have no way of recovering that money. So Mr. Homley, it's up to you. But that's money laundering and quarterbacking. That's not the way it happened. The, when I pointed out to the court the email string. The last email is Vera Roble replying to Mr. Homley. And she says, I don't want to tell you guys what to do. Now, she's referring to Mr. Homley, but at the same time, when she uses the plural, she must be referring to her husband, Steve. I'm just trying to instigate some discussion to get you guys to look at it. Each month, when it is time to pay bills, there is no money, so I advance from Roble Construction, thinking we'll get caught up when there is a closing, there hasn't been enough closings. Members of the court, is that a meeting of the minds? Is that an agreement to personally guarantee? Is that an agreement other than what Mr. Roble testifies to was the oral? And to address the statute of frauds argument, that's exactly what this is all about. Is that the purpose of the statute of frauds is to prevent people such as Steve Roble, saying, by the way, Andy Homley said this, and Mr. Homley saying no. Did the district court make any ruling on the application of the statute of fraud? They did not. They did not. They didn't think it was necessary because they don't believe that the three requirements were met. But to address that issue, that's the reason the statute of fraud exists. The statute of fraud, specifically in Kansas, says it is any time you agree to pay money for the debt of another, it has to be in writing. And here, they're saying 71,000, but actually they're saying 431,000, and there's a big difference there. And so I think that you look at that in its totality, and it is, if you had applied the rules, done it according to Hoyle like you did when you formed the LLC, you wouldn't be in this predicament. You either, number one, wouldn't have advanced the money, you just would have called quits and shut down the corporation. Or you would have come to a meeting of the minds and agreements with promissory notes and personal guarantees. You wouldn't have to, after the fact, try to invent things outside of an operating agreement. We believe the lower court's decision was a sound one, and it should be affirmed by this court. And if there's no other questions, I will surrender the rest of my time. Okay, thank you, Mr. White. Thank you. Ms. O'Donnell? Quickly, I'd like to touch on the lower court's order. If you read the order, it didn't find the paragraph eight has three requirements outlined in it. It simply says that it requires robo-construction to make a request for a personal guarantee, and there's no evidence indicating he made this request. That was what the lower court based its opinion on. Would this case be easier if it were less of a handshake? Yes, it would have been. But that does not mean we don't have the writings requirement, when viewed in the light most favorable to plaintiff, where a reasonable jury can infer there was a personal guarantee here that meets the requirements of the statute of frauds. Appellee wants to continue to argue in requirements within paragraph eight of the buy-sell agreement that just simply don't exist. The plain language requires a request from company and lender to trigger the personal guarantee. If he thinks this is ambiguous and wants to battle it out in the lower court, by all means, let's send it back. But what we're arguing and what I'd like to really reinforce for the court is that paragraph eight of the buy-sell agreement is evidence that Homley was on notice he might have to be personally liable for company debt if requested by lender and company. And when that paragraph is taken in consideration with the 2006 email and the financial statements, that constitutes a writing which demonstrates his personal guarantee for this loan. Further, the fact that Homley was sent financial statements over four and a half years that said, this is the growing receivable for mobile construction. This is the amount you have to pay to clear the loan, is at the very least evidence from which a reasonable jury could infer that Homley, his mindset, that he had agreed to personally guarantee this loan. And that he called Sarah Laffer panicked because of his personal guarantee on this loan and the fact that he was liable for 40% of that loan. Given the three documents, the 2006 email, paragraph eight of the buy-sell agreement, the financial statements, the deposition testimony, and Homley's own behavior, we're asking this court reverse amend the lower court because this evidence raises reasonable inferences as to whether Homley personally guaranteed this loan in writing. And we ask that it be reversed for further litigation. Thank you. Okay, thank you very much. Well, we will take it under advisement and be back in due course. We thank you for your arguments.